## UNITED STATES v. MARYLAND CASUALTY CO.

(Circuit Court of Appeals, Fourth Circuit. June 10, 1924.)

No. 2214.

United States ☞51(1)—Surety on bond of disbursing agent held liable for money drawn on his official check, though not presented for payment until after his resignation.

Under the terms of a bond executed by a special disbursing agent for a department, conditioned that he should safely keep, pay out, and account for all money advanced to him or coming into his hands as such agent, money placed to his credit in the treasury subject to his check, is advanced to him, and his surety is liable for his failure to account for sums drawn on his checks, issued in his official capacity, though not presented for payment until after his resignation had become effective.

In Error to the District Court of the United States for the District of Maryland, at Baltimore; Morris A. Soper, Judge.

Action at law by the United States against the Maryland Casualty Company. From the judgment, the United States brings error. Reversed.

Frederick W. Brune, Asst. U. S. Atty., and A. W. W. Woodcock, U. S. Atty., both of Baltimore, Md.

Charles T. Reifsnider, of Baltimore, Md. (Austin J. Lilly, of Baltimore, Md., on the brief), for defendant in error.

Before WOODS, WADDILL, and ROSE, Circuit Judges.

ROSE, Circuit Judge. The United States of America, plaintiff below, is here plaintiff in error. The defendant in error is the Maryland Casualty Company, a Maryland corporation, and it was defendant below. For brevity they will be called the government and the surety, respectively.

On July 12, 1920, a certain Hugh A. Weeks was appointed special disbursing agent in the Department of Commerce. As he was to be charged with the disbursement of public moneys, R. S. § 3614 (Comp. St. § 6603), required him before entering upon the duty to give bond in such form and with such security as the Secretary of Commerce might approve. Accordingly on the 21st of July he and the surety executed and delivered to the government the bond here in suit. It recited his appointment by the Secretary of Commerce in the service of the Bureau of Foreign and Domestic Commerce as a special disbursing agent for the Department of Commerce, for the disbursement of moneys from any appropriation which the Secretary of Commerce might designate. The condition of the bond was that Weeks should well and truly execute and discharge all the duties of said office of special disbursing agent according to the laws of the United States and the regulations of the Department of Commerce made in conformity therewith, safely keeping, correctly paying out and accounting for all sums of public money advanced to him or coming into his hands from time to time, without loaning, using, depositing in bank, or exchanging for other funds than as allowed by law. The penalty of the bond was

$5,000, and 10 days later, on the 31st of July, there was placed by the Treasurer of the United States to the credit of Weeks as such special disbursing agent $5,000 of government money. Weeks in his official capacity was sent to Paris. He there so conducted himself as to require his recall to this country. He got back to New York on December 11, 1920, and at the close of business that day his resignation was accepted, but it was not until 9 days later that the Treasury Department obtained possession of the blank checks and departmental identification card in his possession. He actually issued check for the entire $5,000 that had been placed to his credit, and succeeded in drawing all of it out of the Treasury of the United States. For $1,337.15 he accounted to the government. For $3,662.85 he made no account whatsoever. He would have been entitled to $700 for salary and expenses from November 1 to December 11, inclusive, and for that amount the government waived any technical claim which might possibly arise out of his failure to account, but it insists that it was entitled to recover from the surety the remaining $2,962.85.

The surety admitted its liability for $2,162.85 which had been improperly withdrawn by Weeks and had been actually paid out by the Treasurer of the United States on or before the date of Weeks' resignation. The dispute in the case is as to the remaining $800. So far as the record discloses, and doubtless so far as is known to either of the parties to the instant suit, the facts are that Weeks drew two checks, each dated December 11, one for $500 and the other for $300. The first of these he cashed in New York on December 13, and the second in Richmond, Va., a week later. It follows from what has been said that there is no question that Weeks did misappropriate this $800, that it was part of the $5,000 which, after the surety delivered the bond in suit, had been put to his credit as disbursing agent, and that he would not have had any opportunity to get it, had the bond not been given. The surety nevertheless contends, and the learned judge below held, that this $800 was not money advanced to him or coming into his hands during his employment by the government as a disbursing agent, because at the close of business on December 11, the money was still in the actual possession and under the control of the Treasurer of the United States. It had not then in any physical sense come into the hands of Weeks, nor was it in the view of the surety and the court below money advanced to him. In other words, as they looked at it, no advance was made to Weeks until his check against the $5,000 was actually paid by the Treasury Department, and as these two checks in controversy were not in fact cashed until some days after he had ceased to be the disbursing agent, they were not covered by the bond.

In this view, we cannot concur. The government has long found it convenient to have disbursing agents. Money has to be put under their control, and it is necessary that they be given power to check against the money so deposited by the government to their credit. Their checks are drawn and are paid by the Treasury before they account with it. Any other method of doing business would defeat the object of their appointment. The government safeguards itself by requiring them to give bonds to make good to it any of its money which they

may improperly pay out. For its further protection, to keep them out of temptation, and to diminish the chances of their making harmful mistakes, it lays down rules and regulations to govern them. It requires them to keep in government depositories any money put under their control, and it subjects them to civil and criminal penalties for dealing with that money in ways other than those it has prescribed. Bonds, rules, and regulations are necessary, because in a very real sense the government money is advanced to them when it is put to their credit in the Treasury Department and made subject to their checks. A quarter of a century ago, Attorney General Griggs pointed out that, when disbursing officers drew checks against money already appropriated and placed in the Treasury for meeting such drafts, the Assistant Treasurer had nothing to do except to pay the checks in money when presented. 22 Op. Attys. Gen. 639.

On the day these checks bore date, Weeks still had the apparent authority, if not the moral right, to draw checks against the funds to his credit in the Treasury. The government officials, who in New York received Weeks' resignation, did not then get from him his blank checks and identification card. The record discloses nothing further on that subject, and, as negligence is not to be assumed without proof, the presumption must be that there was some good reason why they did not or could not. Even so, they might have notified the Treasurer of the United States not to pay any subsequently presented checks of his. Whether they would have been entitled to do so, or whether the Treasurer would have been justified in acting upon such notice, is open to question. Much hardship and injustice might be inflicted upon innocent third parties by the summary stopping of the payment of checks which a duly appointed disbursing agent had issued during his term of office, merely because they did not happen to be presented to the Treasurer until after he had left the government service. Indeed, we do not understand that the surety claims the mere failure of government officials to take precautions open to them would exonerate it. In any event, we do not in this case think it would be either necessary or proper to pass on that question.

In the court below, there was a written waiver of a jury, and the case was tried by the judge upon an agreed statement of facts, the material portions of which we have summarized. Each party presented to the court prayers embodying its theory of the applicable law. The learned judge granted those asked for by the surety and refused those requested by the government. In so doing we think there was error. It follows that the judgment below must be reversed, and the case remanded for a new trial.

Reversed.